**ELECTRONIC ENTERPRISES, Inc. v. UNITED STATES.**

No. 47605.

United States Court of Claims.

Nov. 6, 1951.

Bernard Hellring, Newark, N. J., for plaintiff. Greene & Hellring, Newark, N. J., were on the brief.

John R. Franklin, Washington, D. C., with whom was Acting Asst. Atty. Gen. Newell A. Clapp, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

LITTLETON, Judge.

Plaintiff in this action seeks to recover compensation under Sec. 17(a) of the Contract Settlement Act of July 1, 1944, 58 Stat. 649, 665, 41 U.S.C.A. § 117(a), for radar vacuum tubes, type VU–111, manufactured for the Navy under an informal contract consisting of a notice of award of contract. In support of its claim, plaintiff contends that the tubes were produced by it in accordance with the terms of its written offer of February 12, 1945, and the Navy's written notice of award of February 17 (finding 9); that the Navy requested that production be commenced prior to the execution of a formal contract; that production was commenced and carried on in good faith pursuant to the Navy's request; that upon receipt of the formal contract which varied the terms of the offer, the plaintiff, upon execution of such contract, stopped production, and is here seeking compensation for the tubes produced in accordance with the offer and notice of award. The Government asks that we deny plaintiff recovery for 3,160 VU–111 tubes, manufactured on the ground that the tubes produced did not meet the terms of plaintiff's offer and defendant's notice of award, which terms defendant insists, were the same as those set forth in the formal contract. Defendant further insists that regardless of the precise terms of the plaintiff's offer and defendant's notice and offer of award, plaintiff, under the circumstances of this case, was on notice and should reasonably have anticipated that the terms and requirements of the formal contract for the additional tubes would be exactly what they were and, therefore, plaintiff is bound by the terms of that formal contract and, therefore, has no cause of action under Sec. 17(a) of the Act.

During the period from 1942 to 1945 the plaintiff was engaged solely in manufacturing electronic tubes of various types. In May 1943, pursuant to inquiries from the War and Navy Departments, this company undertook to manufacture, for the first time in this country, a vacuum tube, type VU–111, which was used as a high voltage rectifier in British designed radar units. Plaintiff's original production contract was with the Signal Corps and called for the produc-

tion of 17,999 tubes, at a price of $7.25 each, the tubes to meet certain stated Signal Corps specifications. Plaintiff also received a contract from the Navy on December 3, 1943, for 1,000 tubes at a price of $7.25 each, these tubes to meet the latest issue of British specifications. These specifications, among other things, required that during the course of manufacture, sample tubes were to be selected at random, and were to be subjected to a 500-hour life test with 60-cycle current.

These life tests and the inspection of the tubes during their manufacture were conducted under what was known as JAN test procedure. This expression refers to the joint Army-Navy cooperative testing services set up due to a shortage of qualified inspectors during the war period, to facilitate tube testing and inspection. Under this system a resident Army or Navy inspector was assigned to each factory to conduct all the tests and inspection, irrespective of whether a particular contract was for the Army or Navy. In plaintiff's case, the testing was assigned to a Signal Corps inspector who conducted the life tests previously mentioned, and inspected the VU–111 tubes produced to determine compliance with the specifications of the Army and the Navy contracts.

At the time plaintiff was performing the above mentioned contracts, a procedure known as type approval existed, whereby a set of four to eight tubes would be submitted to either an Army or Navy laboratory under the joint testing program, for submission to a series of tests formulated for each particular type tube by the joint testing service. Upon successful passage of the tests, a type approval certificate would be issued to the manufacturer, and thereafter in the letting of contracts, manufacturers having type approval would be given preference. However, type approval was not compulsory, and plaintiff, despite repeated attempts from 1943 to 1945, was never able to obtain more than a tentative type approval certificate on the VU–111 tube. Type approval of the VU–111 tubes was not required under either the Army or Navy contract.

In 1944, while tubes were being produced by plaintiff under the aforementioned contracts, the Joint Army-Navy Electron Tube Committee, in conjunction with officials of plaintiff corporation, devised new specifications for the VU–111 tube. The new specifications, designated as JAN–1A, substituted a life test of 500 hours at a frequency of 500 to 1,000 cycles per second for the original 500-hour life test conducted at 60 cycles per second, and in addition required that type approval be obtained by the manufacturer. Plaintiff was not required to meet these new specifications by the contracts under which it was then producing tubes for the Government. Compliance with the new specifications would have required new testing equipment which was unavailable at that time.

By January 1945, plaintiff was nearing completion of production of VU–111 tubes under the Army contract. Inasmuch as plaintiff's production facilities for this particular tube were still set up and in operation and, if dismantled, could not be quickly restored for production, plaintiff inquired of the Navy whether it would require more tubes of the same type. In response to this inquiry, on January 31, 1945, plaintiff received a telephone call from Lieutenant Graff, a negotiator in the Procurement Section for the Electronics Division of the Bureau of Ships, who inquired whether plaintiff could produce and deliver an additional 4,400 VU–111 tubes within sixty to ninety days. Following another phone call from Lieutenant Graff, O. H. Brewster, the general manager of plaintiff, sent a letter of offer to the Navy Department on February 12, 1945, which provided in pertinent part:

"Gentlemen: Confirming our telephone conversation, our price on the Type VU–111 is as follows:

"4,400–VU–111, JAN tested, Navy inspected: $6.25 ea.

\* \* \* \* \* \*

"We do not require additional facilities or personnel to handle this contract.

\* \* \* \* \* \*

"We have supplied this type in appreciable quantities for the U. S. Signal Corps. and on a previous Navy order, and trust we will be favored by this release."

In reply, the Navy Department, on February 17, 1945, sent plaintiff a notice of award, providing as follows:

"Unclassified Formal Contract NXsr–91936 to be dated 19 February, 1945—is hereby awarded to you for $27,500.00 covering 4,400 Vacuum Tubes, Type VU–111.

"Delivery Schedule: Complete in 90 days from date.

"Priority Rating AA–1. Controlled Materials Plan on reverse side.

"The Formal Contract which is now being prepared, and which will be forwarded to you for execution, will be in the current standard Bureau of Supplies and Accounts form including all provisions required by law.

"Pending the preparation and execution of the definite instrument you are requested to proceed immediately with performance."

Mr. Brewster, plaintiff's general manager who negotiated the contract, testified that in using the expression "JAN tested, Navy inspected," in his letter of offer, he meant that the tubes would be tested in plaintiff's factory by the resident Signal Corps inspector of the Joint Army and Navy Inspection Service, according to the same testing procedure used in the plant under the prior Army and Navy contracts. Mr. Brewster understood the description of the tubes set forth in the Navy's notice of award to call for the same VU–111 tube which plaintiff had produced and delivered under its earlier Army and Navy contracts.

Plaintiff, meanwhile, had already commenced production on or about February 14, 1945, in anticipation of the award of the contract, which was made on February 17. On February 23, 1945, plaintiff wrote to the Bureau of Supplies and Accounts, Navy Department, acknowledging receipt of the notice of award and request to proceed, and stating further that: "Work on this contract is going forward immediately and will be completed on schedule."

On February 27, 1945, plaintiff received a formal contract from the Navy's Bureau of Supplies and Accounts for the 4,400 VU–111 tubes. By that date plaintiff had already produced 3,160 tubes. Much to plaintiff's surprise, the contract required that the tubes should be produced in accordance with the requirements of the JAN–1A specifications adopted on July 19, 1944, which included, among other things, the necessity for obtaining type approval. In addition, the contract provided that plaintiff should obtain such type approval on the tube within thirty days after notification of the award, and that if plaintiff undertook manufacture prior to the granting of type approval, it would do so at its own risk.

Plaintiff executed the contract, but immediately stopped production until such time as it might obtain type approval or a waiver thereof. No tubes were manufactured under this contract. Plaintiff had available at its plant equipment for making the 500-hour test at 60 cycles, but it did not have the equipment necessary for conducting the 500-hour life test at 500 to 1,000 cycles required by the JAN–1A specifications. Meanwhile, the JAN inspector assigned to plaintiff's factory preliminarily accepted the 3,160 VU–111 tubes, inasmuch as they had passed factory tests of the same character that had been required of such tubes under plaintiff's prior Government contracts, but final acceptance was withheld pending the obtaining of type approval as specified by the new formal contract. Thereafter, on several occasions, plaintiff submitted sample lots of tubes for type approval, but type approval under JAN–1A specifications was never obtained. Nor was plaintiff successful in its efforts to get a waiver of the JAN–1A type approval requirement, and as a result, no tubes were delivered to the Navy within the 90-day period specified in the contract for completion.

Subsequent to the termination of hostilities, on September 6, 1945, the contract was terminated for the convenience of the Government. On October 10, 1945, plaintiff filed a contract settlement claim requesting $22,579.76 as compensation for the VU–111 tubes manufactured and materials obtained to fulfill the contract. On February 6, 1946, the Navy contracting officer rejected the entire claim because of plaintiff's failure to obtain type approval. Plaintiff subsequently appealed to the Appeal Board of the Office of Contract Settlement which affirmed the contracting officer's decision.

948

Electronic Enterprises, Inc. v. Navy Department, 1 App.Bd., OCS No. 60.

Plaintiff seeks to recover $21,376.46, under Sec. 17(a) of the Contract Settlement Act of 1944, 58 Stat. 649, 665, 41 U.S.C.A. § 117(a), contending that it is entitled to recover the price of $6.25 quoted in its offer and in the notice of award for the 3,160 tubes which it, in good faith, manufactured prior to the receipt and signing of the formal contract. Section 17(a) provides: "Where any person has arranged to furnish or furnished to a contracting agency or to a war contractor any materials, services, or facilities related to the prosecution of the war, without a formal contract, relying in good faith upon the apparent authority of an officer or agent of a contracting agency, written or oral instructions, or any other requests to proceed from a contracting agency, the contracting agency shall pay such person fair compensation therefor."

The declared legislative purpose of this section was to give relief in those situations related to the prosecution of the war, where the Government received materials under either an informal contract or without any contract, and for which the Government should in good faith pay. The Act simply attempts to extend to such situations the principles of fairness which are applied to ordinary business transactions (Senate Rept. No. 539, Pt. 2, p. 13, 78th Cong., 2d Sess.).

Section 17(a) has been the basis of much litigation before the Appeal Board of the Office of Contract Settlement. It has been construed with care, and has been held applicable only to cases where certain conditions have been fulfilled. First, the supplier must prove the existence of a request by a contracting agency or war contractor to furnish materials or services. Second, the request must have been relied upon by the supplier. A purchase order or a contract is not considered to be a request within the meaning of Sec. 17(a). Third, the reliance must have been in good faith. Fourth, the arrangement to furnish, or the furnishing of, the materials, services, or facilities, must have been in strict compliance with the request; and last, the circumstances must be such that the basic principles of justice require that the contracting agency

be held liable. Alexandrian Corporation v. Department of the Army, 4 App.Bd., OCS No. 173, p. 198; Motor Products Corporation v. Department of the Army, 4 App. Bd., OCS No. 298, p. 1; Tuscon Ore Milling Co., Inc. v. Reconstruction Finance Corporation, 3 App.Bd., OCS No. 28, p. 114; Maryland Sanitary Manufacturing Corporation v. War Department, 1 App.Bd., OCS No. 10; Rice Barton Corporation v. United States, 88 F.Supp. 271, 115 Ct.Cl. 575, 592.

There is no contention that plaintiff has not fulfilled the first two conditions. The evidence clearly indicates that there had been a telephone conversation between plaintiff's officials and the Navy's procurement officer regarding plaintiff's ability to produce VU–111-type tubes, and that thereafter plaintiff received a formal notice of award of contract, in which it was requested to proceed with production immediately, without awaiting execution of the formal contract. All of the 3,160 tubes in question were produced under the proceed order and were completed prior to the receipt of the formal contract.

However, the Government does insist that plaintiff did not fulfill conditions three and four because plaintiff did not, in good faith, rely on the request, and did not perform in strict compliance with that request. In support of its contention that plaintiff did not, in good faith, rely on the request, the Government points out that plaintiff's offer stated that the tubes would be "JAN tested," and the Government contends that "JAN tested" meant that the tubes would be manufactured according to the JAN–1A specifications adopted in 1944 for VU–111-type tubes. This phase of the Government's contention is predicated on its position, with which we cannot agree, that the terms "JAN tested" and "JAN–1A specifications" may be used interchangeably, and are in fact synonymous. Therefore, the Government argues that the plaintiff could not, in good faith, have been referring to any specifications other than JAN–1A specifications when it used the expression "JAN tested" in its offer. Defendant also says that plaintiff had actively assisted in the development of these new specifications, knew of their adoption in 1944, was familiar

with the requirements contained in the JAN–1A specifications, and knew that type approval would be necessary to comply with these specifications.

We cannot agree with these arguments. The evidence does not substantiate the defendant's theory that the terms "JAN tested" and "JAN–1A specifications" are synonymous. As we have previously stated, the JAN test procedure referred to the cooperative wartime practice of assigning either an Army or Navy inspector to each plant to conduct the necessary tests on all Government contracts, whether for the Army or Navy. The term "JAN specifications" refers to the tests and requirements for each type tube developed under a similar but different cooperative program. Under JAN test procedure the inspector would apply to the tubes being produced whatever specifications, whether JAN specifications or otherwise, the contract in production called for. In the instant case there was no formal written contract in existence at the time production was commenced, and consequently plaintiff, during the manufacture of the 3,160 tubes in question, had before it no written specifications. The notice of award under which plaintiff was proceeding only mentioned that the tubes were to be type VU–111's and made no mention of *any* specifications. It therefore becomes necessary for us to look to the preliminary negotiations to see what was contemplated by the parties with respect to specifications.

Nothing in the negotiations gives any indication that plaintiff was informed that the tubes would have to conform to JAN–1A specifications. On the contrary, the wording of plaintiff's offer of February 12, 1945, wherein it was stated that plaintiff had manufactured and supplied this VU–111 type tube to the Government in appreciable quantities on prior Navy and Signal Corps contracts, clearly indicates that plaintiff contemplated that the tubes were to be of the same specifications as those produced on the contracts mentioned. The plaintiff's statement in the offer that it would not require additional facilities is also significant in this respect, inasmuch as the facts show and it was apparent to those who were familiar with the VU–111 tube that plaintiff

would have needed additional testing equipment had it attempted to produce VU–111 type tubes complying with JAN–1A specifications. Another significant fact clearly indicating that plaintiff's offer for additional tubes was for the same type VU–111 tube it had previously furnished, to be inspected and tested by the same standards, was that the price per tube was less than the unit price paid under prior contracts.

The plaintiff's offer was so clear that there was no reasonable ground for a misunderstanding of it by the procurement officers of the Navy. Moreover, we are of opinion from the record that they understood and interpreted the offer exactly as plaintiff had intended when they prepared the written notice of acceptance and award of a contract and notice to proceed. The language of the notice of acceptance and award was the same as that contained in plaintiff's offer, that is, "4,400 Vacuum Tubes, Type VU–111."

The Navy Department procurement officers took no steps to make clear an intention, if they had any such intention when plaintiff's offer was accepted, that production under the new contract must conform to the new JAN–1A specifications. We therefore conclude that it is reasonable to interpret plaintiff's offer and especially the statement therein that the tubes would be "JAN tested, Navy inspected," as meaning that the additional tubes would be tested by the resident JAN inspector according to the same specifications as had been applicable to tubes under the prior Navy contract.

Nor is there any indication that plaintiff was informed that *type approval* would be required. There is evidence of a highly conflicting nature regarding certain telephone conversations which took place during the preliminary negotiations. The conversations were between a Government procurement officer who was not authorized to enter into contracts on behalf of the Government, and two representatives of plaintiff (finding 7). There was some testimony, far from conclusive, that a Mr. Dennison, an unauthorized employee of plaintiff, was asked whether or not plaintiff possessed type approval for the tubes

it was proposed should be furnished. However, neither plaintiff's offer, which was set forth in a letter confirming a later telephone conversation between Mr. Brewster, an authorized representative of plaintiff, and the Government procurement official, nor the subsequent notice of award from the Navy Department, contained any reference to the type approval requirement. We therefore conclude that the evidence of the contract negotiations fails to establish that plaintiff was aware of the necessity for securing type approval on the tubes it was to produce. In addition, since we have already concluded that "JAN tested" and "JAN specifications" are not synonymous, and since type approval is an element of "JAN specifications" and not an element of "JAN tested," the use of the term "JAN tested" in plaintiff's offer is no indication that plaintiff knew that type approval would be required. On the whole record we are of the opinion that the insertion in the formal contract sent to plaintiff for execution on February 27, 1945, calling for inspection and testing under JAN–1A specifications, was an afterthought on the part of the Navy procurement official.

■ When plaintiff commenced producing tubes which met in every way the specifications required on its former Navy contract and which were subjected to JAN testing, it was complying with the terms of its offer, which terms had been accepted by the Government without qualification, as evidenced by the language of the notice of award. It thus follows that plaintiff was proceeding in good faith within the meaning of Sec. 17(a) of the Act, and in strict compliance with the terms of the request. Therefore, under the principles of justice and fair dealing, plaintiff should be compensated.

■ Although plaintiff subsequently executed a formal contract with defendant, which contained a provision calling for both type approval and compliance with JAN–1A specifications, the execution of the written contract does not destroy plaintiff's claim under Sec. 17(a) for work already done pursuant to the Navy's award and request to proceed, and prior to the receipt and execution of the formal contract. It has been held that where the contract received by the contractor is materially different from the one contemplated by him, his Sec. 17(a) claim is not barred. In P. E. Harris & Co. v. War Department, 1 App.Bd., OCS No. 55, it was stated that the rule in cases where services were rendered without a formal contract but thereafter a formal contract was executed, is that "the subsequent execution of the formal contract will not serve to deprive appellant of compensation if the contract so executed is not the one which he was entitled to assume he would receive when he acted upon the government's original request."

■ The Navy contract which was received by plaintiff on February 27, 1945, and which provided that plaintiff must obtain type approval, and must comply with JAN–1A specifications, constituted the first notice to plaintiff that defendant expected the tubes to meet these requirements. Production was stopped immediately upon receipt of this formal contract and no tubes were produced under its terms. Under such circumstances we conclude that the contract of February 27, 1945, was not the contract that plaintiff was entitled to assume it would receive when it began production at the Navy's request, and does not extinguish plaintiff's claim under Sec. 17(a).

There remains to be determined the amount which plaintiff is entitled to recover. Defendant insists that recovery should be limited to the actual costs incurred by plaintiff. However, under the facts and circumstances of this case we are of the opinion that it is reasonable to allow plaintiff the $6.25 per tube requested by it for the 3,160 tubes actually produced. This is the price stipulated in the Navy's notice of award and instructions to proceed, and, while this notice did not constitute a binding contract to pay this amount, it was in reliance on the terms of this request that plaintiff proceeded. Accordingly, we conclude that the plaintiff is entitled to recover the unit price of $6.25 per tube, stipulated in the offer and notice of award as fair and reasonable compensation under Sec. 17(a) for the 3,160 tubes actually manufactured,

plus the amounts stipulated by the parties as covering the value of work in progress and raw materials. Judgment will accordingly be entered for plaintiff for $21,376.46. It is so ordered.

JONES, Chief Judge, and HOWELL, MADDEN and WHITAKER, Judges, concur.