satisfactorily held by plaintiff during his active service with the Coast Guard, and in line with the Miller and Alger decisions, and for the reasons stated therein, we hold that plaintiff is and has been since October 1, 1949, entitled to the retirement pay of a Rear Admiral of the upper half under the provisions of Section 511(b) of the Career Compensation Act of 1949, supra. As an alternative contention, plaintiff has argued that he is entitled to the identical retirement benefits under the Act of April 8, 1946, supra, but having held that he may recover under the provisions of Section 511(b), we find it unnecessary to decide the issues raised by that contention.

Plaintiff's motion for summary judgment is granted, and defendant's motion for summary judgment is denied. Entry of judgment is suspended pending the filing of a report by the General Accounting Office showing the amount due plaintiff in accordance with this decision.

It is so ordered.

JONES, Chief Judge, and MADDEN and WHITAKER, Judges, concur.

**REMINGTON RAND INC.**

v.

**UNITED STATES.**

No. 49176.

United States Court of Claims.

May 4, 1954.

Errett G. Smith, Washington, D. C., for plaintiff.

Carl Eardley, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges.

JONES, Chief Judge, delivered the opinion of the court:

Plaintiff sues for $126,187.96 which allegedly represents its cost in certain development work on the image orthicon pickup tube, a supersensitive electronic device designed for television cameras in connection with guided missile weapons. Recovery is said to be grounded on either an implied contract within our general jurisdiction[1] or section 17 of the Contract Settlement Act of 1944.[2]

This litigation grew out of a contract between plaintiff and the Army's Aircraft Radio Laboratory (hereinafter ARL) dated June 13, 1944, and executed July 11, 1944. Under this contract plaintiff agreed to furnish and deliver for a fixed fee, five television cameras (hereinafter "conversion units") equipped with the image orthicon tube, plus five spare tubes. It is plaintiff's position that while it contracted to furnish these image orthicon tubes for a fixed fee, the circumstances under which the contract was executed and performed renders the Government liable on an implied contract for certain costs incurred in their development and production. It is said that the contract presupposed certain technical assistance from the Radio Corporation of America which was not forthcoming. We summarize below such portions of our findings as are pertinent to this opinion.

The idea for the image orthicon tube was conceived by a scientist in the employ of the Radio Corporation of America (RCA). It represented a considerable advance in the television field and after further development work RCA created original models about 1939 or 1940. Recognizing the merit of the tube, the National Defense Research Council (NDRC) entered into a contract with RCA whereby NDRC bore the expense of further development.

Prior to 1943, simpler tubes were also developed by RCA, the first being the plain (as opposed to the *image)* 2-inch orthicon tube, and the second an iconoscope. With the development of the iconoscope, RCA's interest in the orthicon tube diminished and it abandoned orthicon development.

Plaintiff, through NDRC, requested technical assistance in the design, engineering, and processing of the 2-inch orthicon tube from RCA. Two of RCA's engineers were sent to plaintiff's plant to render such assistance, one in October 1942 and another in April 1943.

RCA's development of the more sensitive image orthicon tube was sufficiently advanced at the end of 1943 to allow the execution of a production contract with the Navy, and the first tubes under the contract were delivered in January of 1944. However, many production and development problems had to be dealt

1. 28 U.S.C. § 1491 (1952 ed.) provides in part:
"The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States: * * * (4) Founded upon any * * * implied contract with the United States".

2. Section 17 of the Contract Settlement Act, 58 Stat. 649, 665, 41 U.S.C.A. § 117, provides:
"(a) Where any person has arranged to furnish or furnished to a contracting agency or to a war contractor any materials, services, or facilities related to the prosecution of the war, without a formal contract, relying in good faith upon the apparent authority of an officer or agent of a contracting agency, written or oral instructions, or any other request to proceed from a contracting agen-

cy, the contracting agency shall pay such person fair compensation therefor.
"(b) Whenever any formal or technical defect or omission in any prime contract, or in any grant of authority to an officer or agent of a contracting agency who ordered any materials, services, and facilities might invalidate the contract or commitment, the contracting agency (1) shall not take advantage of such defect or omission; (2) shall amend, confirm, or ratify such contract or commitment without consideration in order to cure such defect or omission; and (3) shall make a fair settlement of any obligation thereby created or incurred by such agency, whether expressed or implied, in fact or in law, or in the nature of an implied or quasi contract."

with in the first few months and two out of every three tubes produced were defective. Production throughout 1944 was carried on in the RCA laboratories and averaged five to ten tubes per month.

During 1943 the Navy was also in contact with plaintiff in connection with an orthicon type television camera which plaintiff was interested in selling to the Navy. However, Navy officials stated that in view of information which they had received concerning a new version of image tube development they were not interested. In October 1943 plaintiff was engaged in the development of a "two-sided mosaic," which is the main feature of the image tube that distinguishes it from other tubes referred to herein. The actual work on this two-sided mosaic, subsequently utilized in the image tube, had been on process for a considerable period of time before October 1943.

On January 26, 1944, plaintiff demonstrated a conversion unit constructed around a vericon tube (this being plaintiff's name for the plain orthicon 212 tube) to certain representatives of the Army and Navy. On February 9, 1944, plaintiff's vice president and chief electronics engineer conferred in Washington with General McClelland, Air Communications Officer of the Army, his assistant, Colonel Norvell, and others relative to the possibility of plaintiff's producing the equipment which had been demonstrated on January 26. Plaintiff's vice president, Mr. Allen, offered to build 50 conversion units utilizing the vericon 212 tube. Army officials indicated a desire to incorporate the image tube in at least five of their units.

It appears that while plaintiff was very interested in a contract for the conversion units on some basis, it was reluctant to undertake the production of the image tube inasmuch as its development facilities were otherwise occupied. In the course of various discussions representatives of the Army stated their willingness to make an effort to obtain certain technical assistance for plaintiff from RCA.

It seems clear that during the earlier stages of the negotiations both parties thought that technical assistance from RCA would be forthcoming. This was true on March 9, 1944, when Mr. Harris of ARL visited plaintiff's laboratory concerning Army procurement. A memorandum was made of this conference, item 2 of which covered "Proposed Development Contract for 5 Conversion Units Using Image Orthicon, and the production of Image Orthicon by Remington Rand." This memorandum noted that there were to be five conversion units at $10,000 each and five spare image tubes at $1,000 each, a total of $55,-000. This served as an informal estimate for the letter of intent which was subsequently issued on April 13, 1944.

In the meantime, some difficulty was encountered in obtaining technical assistance and on April 13, 1944, plaintiff's chief engineer, Mr. Lamb, was informed by the Naval Inspector at the RCA laboratory that RCA would not furnish engineering data without a directive. This directive would presumably have had to issue from the General Staff.

Efforts to obtain the necessary information from RCA were first made by the Navy and later by NDRC. Neither was successful.

After plaintiff was fully aware that efforts to obtain assistance from RCA were stymied, its chief engineer wrote Colonel Eaton of ARL the following letter on May 4, 1944:

"Subject: Image Orthicon Development.

\* \* \* \*. \* \*

"We are very appreciative of your action in requesting assistance from NDRC in connection with the development contract between A. R. L. and ourselves for five Image Orthicon type conversion units.

"We would like to make it clear that it is not in our program to copy slavishly the design of any existing tube of this type.

"We already have made considerable progress on independent de-

velopment of this generic type pick-up tube, as representatives of A. R. L. know from visits to our laboratory and from reports we have made to them. This development has progressed, of course, from our experience over the past two years in developing and producing the Vericon 212, a two-inch pick-up tube of the orthicon type. Our Image Vericon development is directly an extension on what we already have accomplished with the simpler Vericon and actually has been in progress for over a year as a project unsponsored by any government agency up to the time we were awarded the present contract by A. R. L.

"While development of the Image Vericon would undoubtedly be expedited by full exchange of engineering information with RCA, only such data as may be necessary to insure mechanical and electrical interchangeability between our Image Vericon and the RCA Image Orthicon would be required at this time if it is desired by A. R. L. that the tubes should be interchangeable in the same equipment. These data would include physical dimensions, electrode connector and base-pin locations, and electrical operating requirements.

"If A. R. L. desires such coordination in design, this information should be furnished to us as soon as practicable."

By mid-May of 1944, plaintiff was fully aware of RCA's position, and expected only dimensional drawings (for interchangeability) and sample tubes, and this was all the assistance plaintiff ever received.

Plaintiff desired that ARL write a development contract with an escalator clause which would permit price revision in the event anticipated costs were exceeded. Upon being informed that ARL was limited to the execution of fixed-price development contracts, plaintiff proceeded on a fixed-price basis expecting to overcome initial losses by subsequent orders. On May 24, 1944, plain-tiff submitted its offer in which it proposed to furnish, for a stipulated price of $72,864.68, five conversion units complete with tubes utilizing an image orthicon type of pickup tube. In its breakdown of anticipated costs plaintiff left the column designated for engineering and developing expenses blank, and explained this as follows:

"Direct engineering is included as direct labor since the whole job is essentially engineering and development, and indirect engineering is included in general expense. Any amortization would be reflected in reduced cost on subsequent contracts for the same material."

The proposal was accepted by the Government and the formal contract, dated June 13, 1944, was executed on July 20, 1944 (see finding 18). This contract contained the following article which was typed into this particular contract in addition to the standard form:

"Article 30. *Prior Agreements.*— The letter order hereinbefore mentioned and all amendments thereto, if any, and all prior agreements relating to the subject matter hereof are merged into and superseded by this contract."

In view of the facts recited above we cannot say that plaintiff could have reasonably expected to fulfill the contract without at least some developmental expense on the image tube, nor can we say that such cost was outside this written contract. It is true, as plaintiff points out, that defendant's officers never stated with absolute definiteness that RCA would not furnish the information. It is equally clear, however, that plaintiff was never definitely advised that it would. The tenor of all the discussions on this subject was that the Government would make an *effort* to get the data. A reasonable effort was made which was unsuccessful. Plaintiff entered the contract with knowledge of this lack of success and further agreed by a specially inserted provision that all prior agreements were merged and superseded by the written instrument.

On the record before us it appears that plaintiff also regarded the development cost as being within the terms of the formal contract. No demand for compensation over and above the contract price was made until the spring of 1945 and this request was in terms of the formal agreement. In this written request of May 1945 for a change in the contract price plaintiff stated that its cost to date on the image tube development was $63,500.14. However, reimbursement of this amount was not requested. The request was for $60,000 estimated *future* cost in order to complete the contract. In making its request plaintiff stated:

> " * * * The reason for this is that engineering and development expense for development of the Image Vericon tube was not contemplated *as a major part of the cost* when the proposal for this contract was formulated or when the contract was executed." [Italics supplied.]

This request was denied by the contracting agency.

Plaintiff was never able to furnish the image tube as required by the specifications. The requirements of the specifications had to be reduced to enable the Government to accept the equipment. Due to its inferior performance, the equipment was never used. The contract price, by agreement, was reduced by the sum of $18,216.17 and has been paid.

■ We conclude that while plaintiff may have hoped that RCA assistance might eventually be made available, it entered the contract fully aware that it probably would not. It appears that plaintiff was prepared to absorb the development cost on this contract with the view toward recouping on later orders but the costs involved were underestimated. The development costs for which plaintiff now sues were covered in the written contract. Having entered into a formal express contract fully aware of the uncertainty of development cost, recovery cannot now be had on an implied contract theory covering the same subject matter. Klebe v. United States, 263 U.S. 188, 44 S.Ct. 58, 68 L.Ed. 244, affirming 57 Ct.Cl. 160; Hawkins v. United States, 96 U.S. 689, 24 L.Ed. 607; Johnson v. Igleheart Brothers, Inc., 7 Cir., 95 F.2d 4, certiorari denied 304 U.S. 585, 58 S.Ct. 1058, 82 L.Ed. 1546; Lacchi Construction Co., Incorporated v. United States, 102 Ct.Cl. 324. Similarly, section 17(a) of the Contract Settlement Act is by its terms restricted to situations in which services or materials are furnished *without* a formal contract.[3] Samuel Saffer's Sons v. War Dept., 1 App.Bd. OCS No. 71; Brennan et al. v. Navy Dept., 1 App.Bd. OCS No. 34. See Electronic Enterprises, Inc., v. United States, 100 F.Supp. 944, 120 Ct.Cl. 578. The facts and circumstances of this case do not remove it from this restriction.

■ We do not agree with plaintiff's contention that section 17(b) of the Act, which provides for certain adjustments "whenever any *formal* or *technical* defect or omission in any prime contract * * might invalidate the contract or commitment * * *," (italics supplied) can be the basis of any recovery here. Plaintiff argues that the "defect and omission was that the obligation of the prime contract, in respect to the development work on the image tube should have been more thoroughly reduced to writing." Assuming, *arguendo*, that there was such an "obligation" outside the contract, its omission would surely be one of substance rather than "technical" or "formal," as those terms are used in the statute. Samuel Saffer's Sons v. War Dept., supra.

We conclude that the obligations of the parties with respect to the cost of furnishing the image orthicon tubes were included in the terms of the formal written contract and plaintiff is not entitled to recover here. The petition is dismissed.

It is so ordered.

MADDEN, WHITAKER, and LITTLETON, Judges, concur.

---

3. See note 2 supra.